FELIPE A. PRIAST
309 E. Morehead Street Apt # 326
Charlotte, NC 28202
Phone: 786-417-0199
Email: felopriast@yahoo.com

*In Propria Persona (Pro Se)*

FILED
STATESVILLE, N.C.

JUL  3 2014

U.S. District Court
Western District of N.C.

# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

**200 W. Broad Street, Room 303**
**Statesville, NC 28677**

| | |
|---|---|
| FELIPE A. PRIAST | Civil Case Number: 5:14CV115 |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| DCT SYSTEMS GROUP, INC., | |
| DATAMATICS CONSULTANTS, INC., | |
| Jeffery Telfare Sr., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff asserts this complaint against Defendants and alleges as follows:

## I. NATURE OF THE CASE

Plaintiff Mr. Felipe A. Priast (hereinafter "Plaintiff"), a citizen of Colombia with legal residence in the United States of America, is a Senior independent IT consultant. DCT Systems Group Inc. (hereinafter "DCT Systems") is an American company headquartered in Norcross, GA. Datamatics Consultants Inc. (hereinafter "Datamatics") is an American company headquartered in Duluth, GA.  While working as a contractor for DCT Systems at Lowe's Home Improvement (hereinafter "Lowe's") headquarters in

Mooresville, NC this past January and February of 2014, Mr. Priast discovered that at least one DCT Systems' employee, was engaged in a racket aimed at billing Lowe's for services that were not performed.

Plaintiff was recruited by Datamatics, an IT recruiting firm, and placed at DCT Systems as a contractor with a signed at-will contract for one year. DCT Systems was performing an auditing and governing type of job in Lowes' IT department, a task named "Stage Gating Program", and Plaintiff was assigned to this program.

Plaintiff believes that he was hired by DCT Systems based on his nationality (Colombia) under the assumed negative stereotype that a person of Colombian nationality was going to be willing to participate in the racket already mentioned above, without reporting it to Lowe's upper IT management team or to any other authority with competence in the matter in case he would had been able to discover the existence of the racket, racket which was intended to run unnoticed. Barely five weeks after Plaintiff began working for DCT Systems at Lowe's Headquarters in Mooresville, NC, Lowe's abruptly terminated DCT Systems' contract. In turn, DCT Systems was forced to terminate the contract of all the IT consultants placed by Datamatics with them (against its will), including Plaintiff. Two weeks after Lowe's terminated DCT Systems' contract, Mr. Kevin V. Summers (hereinafter "Mr. Summers), Lowes' Chief Information Officer (CIO), resigned from his post "on a mutual agreement" with Lowe's.

It is the belief of Plaintiff that Mr. Jeffery Telfare Sr. (hereinafter "Mr. Telfare), Program Manager for the Stage Gating program being implemented at Lowe's by DCT Systems, and the President of DCT Systems, Mr. Chittranjan "Chuck" Thakkar (hereinafter "Mr. Thakkar"), were engaged in a racket involving billing Lowe's for consultancy services that did not exist, or at best, that were enormously overestimated, taking advantage of the close friendship existing between Mr. Telfare and Mr. Summers. While the causes for the "mutual agreement" resignation of Mr. Summers from Lowe's were kept under the greatest secrecy by both signatory parties, circumstantial evidence and the chronology of events has led Plaintiff to believe that DCT Systems contract termination at Lowe's and Mr. Summers' resignation from his post are events connected by the suspicion or fact that Lowe's had of the ethical and legal behavior of its own CIO and some DCT Systems' managers working at Lowe's, including Mr. Telfare. Plaintiff beliefs that the termination

of DCT Systems contract at Lowe's owned to the latest's suspicion that there was a racket scheme between its own CIO and some DCT Systems' managers, racket of which Plaintiff was witness, at least in part, and racket because of which he has suffered great monetary damage and a deterioration of his professional image in the IT contracting market. Datamatics was informed of the racket taking place at the interior of Lowe's that Plaintiff witnessed and of the stereotype discrimination involved in the hiring of Plaintiff, and Datamatics failed to take any action to remediate Plaintiff's grievances and complaints.

Plaintiff is a decent, honest, law-abiding legal resident and the burden of these felonious events has proved to be a weight to heavy to continue carrying them. He sues under the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C § 1962 (c) , the Title VII of the Civil Rights Code and the North Carolina General Statutes seeking monetary for actual compensatory and damages, including damages for emotional distress, damages for the physical deterioration suffered derived from the emotional distress, punitive damages and economic loss.

## II. PARTIES

1.  Plaintiff Felipe A. Priast ("Plaintiff") is an individual and a resident of Charlotte, Mecklenburg County, State of North Carolina.
2.  Defendant DCT Systems Group Inc. is a corporation engaged in performing IT consulting services headquartered at 5875 Peachtree Industrial Blvd, Suite 340 Norcross, GA 30092. The President and Owner of DCT Systems is Mr. Chittranjan "Chuck" Thakkar.
3.  Defendant Datamatics Consultants Inc. is a corporation engaged in performing IT consulting services headquartered at 4375 River Green Pkwy, Suite 200 Duluth, GA 30096.
4.  Defendant Jeffery Telfare Sr. is an individual who resides in the greater Atlanta area and has as a mailing address for these proceeds the same address as DCT Systems Group Inc (5875 Peachtree Industrial Blvd, Suite 340 Norcross, GA 30092) at his own request.

### III. JURISDICTION

5.  This court has subject matter jurisdiction to hear this case in accordance with 28 USC § 1332 because this action is between citizens of different States.

6.  Venue is proper in this district in accordance with 28 USC § 1391 because a substantial part of the events or all the actions alleged herein occurred within the state of North Carolina.

7.  The Court has personal jurisdiction over Defendants because they are doing business in North Carolina, have committed acts or omissions in North Carolina with respect to one or more causes of action arising from these acts or omissions, and/or have caused effects in North Carolina with respect to one or more causes of action arising from these effects.

8.  The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000.00 and there is complete diversity among the parties.

9.  Venue is proper because the actions that took place caused injury to Plaintiff in Mooresville, North Carolina.

### IV. FACTUAL ALLEGATIONS

10. Plaintiff incorporate the allegations contained in paragraphs 1 through 9, as if fully set forth herein.

11. In December 2013 Plaintiff was contacted by Frank Kulendran (hereinafter "Mr. Kulendran"), IT, PMO & Risk Advisory Services, to sound his interest in a project at Lowe's. Plaintiff showed interest, and after agreeing on the contract details, Mr. Kulendran arranged a phone interview between Plaintiff and Mr. Telfare, DCT Systems' Program Manager for the "Stage Gating Program" being implemented at Lowe's.

12. During the phone interview Mr. Telfare only seemed interested in the country of origin of Plaintiff and he restrained himself from asking Plaintiff questions related to his level of knowledge or competence to perform the job in question. When Plaintiff

told Mr. Telfare that he was from Colombia, Mr. Telfare seemed pleased and asked more questions about Plaintiff's country. Plaintiff believes that he was profiled based on his country of origin, despite the fact that such types of questions are a violation of the Title VII of the Civil Rights Act, but didn't mention anything at the time because he couldn't had anticipated why Mr. Telfare was asking those questions and because Mr. Telfare seemed pleased, not disturbed, by the answers.

13. Plaintiff was hired by DCT Systems and began working for them on January 13, 2014.

14. In January and February, while Plaintiff was working for DCT Systems at Lowes' headquarters in Mooresville, NC, DCT Systems was involved in a conspiracy (hereinafter "the conspiracy") to defraud Lowe's.

15. The hiring of Plaintiff by DCT Systems was a fraud because, for nearly six weeks, he didn't perform any work for Lowe's. The only purpose of his hiring was to bill Lowe's for IT consulting services that were never delivered and create a false impression of work. For nearly six weeks, Plaintiff received less than 3 hours of training on very simple matters. The rest of the time, Plaintiff was idle but was asked to come daily to the office to cause a false impression of being engage in consulting work.

16. Plaintiff observed that the situation of the other six consultants engaged in the same Stage Gating Program was pretty much the same situation as Plaintiff's: idle most of the time and with very little responsibilities. Presumably the object of their hiring was the same as the one of Plaintiff: to bill Lowe's for consulting services that were not performed. It is the belief of Plaintiff that, with the exception of Timothy McKeithan, another IT Consultant hired on the same day as Plaintiff, the rest of the project managers involved in the Stage Gating Program were aware of the racket existing at the interior of Lowe's and were willing to be a part of it since DCT Systems was paying them to do nothing.

17. During all the nearly six weeks that Plaintiff worked for DCT Systems at Lowe's site Plaintiff was instructed to position his laptop and desk in a way that could not allow Lowe's full time employees to discover that he was not engaged in any work related to his hiring, if they pass by the location were all DCT Systems' contractors used to

sit. The idea was to cause a false impression of work when in reality no work was being performed.

18. Defendants DCT Systems and Datamatics contacted Plaintiff for billing purposes using e-mail and telephone, all of which crossed Interstate lines and reached North Carolina.

19. Plaintiff is a consummated professional in his field, Project Management. Plaintiff has an engineering degree, a Master of Business Administration and a Project Management Professional license. While reviewing some of the Lowe's deliverables created by some of Lowes' project managers engaged in software development projects, Plaintiff discovered that many of the deliverables deemed as "bad" or "under standard" by other DCT Systems consultants were actually pretty good documents. Plaintiff believes that the reason other DCT Systems consultants graded these documents as "bad" or "under standard" was to create confusion and a sense of IT illiteracy among Lowes' IT division, and in this way, create more consulting services opportunities for DCT Systems. In other words, DCT Systems was misleading Lowe's intentionally to increase the potential load of consulting services assigned to them. In at least one occasion Mr. Telfare, DCT Systems Stage Gating Program Manager, instructed Plaintiff and the other consultants "not to sell the shop" and to look for new consulting services opportunities. This meant that we couldn't tell Lowes' ranks what they were doing wrong but just to tell them that they were wrong, without explaining them what was wrong.

20. In at least 2 occasions Plaintiff discovered that the advice given by other DCT Systems' employees to Lowes' managers (in the rare occasions in which they approached DCT Systems' place of work) was intentionally wrong, all these in order to lead Lowe's employees in a direction that would cause more work in the future.

21. Plaintiff believes that Mr. Telfare profiled him based on his country of origin during the hiring interview because Mr. Telfare was counting on the negative stereotype of Colombians existing in the United States, stereotype that portrays them as people bias to illegality and drug-related crimes, something that suit him for the type of racket that he was leading at the interior of Lowes' IT Department.

22. Mr. Telfare was able to pull out this type of racket thanks to his close relationship with Mr. Summers, Chief Information Officer (CIO) at Lowe's. Mr. Telfare presented himself to the rest of the DCT Systems contractors as "the mentor of Mr. Kevin Summers" and added in a group meeting that he had worked with Mr. Summers at least twice in the past, at Whirlpool and Coca-Cola. Mr. Telfare moved around the Lowe's IT Department offices with an absolute air of dominance and control. He had a flexible scheduled and constantly bragged about his close relationship with Lowes' Chief Information Officer, Mr. Summers. Plaintiff estimated that this degree of proximity between Mr. Telfare and Mr. Summers was real and had its privileges.

23. In at least 2 occasions Plaintiff witnessed how Mr. Telfare said that he had given Mr. Summers advice on one subject or another, something that created the impression on Plaintiff that it was Mr. Telfare who was running Lowes' IT Department and not Mr. Summers.

24. Realizing that no work at all was being performed by him or the other consultants at the service of DCT Systems after 3 weeks of work, Plaintiff asked Mr. Telfare as to why no work was being assigned to him. Plaintiff was told that Lowe's top IT Management was not sure as to which way they should go and that some "issues" had emerged, without specifying what kind of issues were these. Plaintiffs believed what Mr. Telfare told him and continue waiting for some work to be assigned to him.

25. After 4 weeks at Lowes' site "working" for DCT Systems, Plaintiff was surprised to realize that Mr. Telfare had hired another consultant, a lady named Freya Harris, to add to the idle DCT Systems' team "working" in Lowes' Stage Gating Program. At this point was when it became apparent to Plaintiff the nature of the racket because it was absolutely clear to Plaintiff that the hiring of Mrs. Freya Harris only had one purpose: to bill Lowe's for her fictitious work.

26. On Sunday, February 16, 2014, Plaintiff received a text message from Mr. Telfare indicating him and all the other consultants associated with the Stage Gating Program "not to show up in the office the following Monday", because something has happened that indicated that Lowe's has abruptly terminated DCT Systems' contract at Lowe's. Plaintiff was told to "stand by" until Mr. Telfare could find out what was going on. Finally, on Wednesday, February 19, 2014, Mr. Telfare informed the whole

1    team that the project was over. No explanations were given either by him or any other

2    DCT Systems employee.

3    27. The following Friday, February 21, 2014, Plaintiff went to Lowe's headquarters to

4    return the laptop and access badge that Lowe's had issued to facilitate his access and

5    perform his "work", and to his entire surprise, he was treated like a criminal by the

6    physical security guards placed at the entrance gate of Lowe's headquarters. He was

7    not allow trespass the premises of the outside parking lot and was forced to call a

8    person from the legal department that, 10 minutes later, came over to receive the

9    items from him. Neither he nor any other person was able to explain to Plaintiff what

10   was going on. The only thing that this person from the Lowe's Legal Department told

11   him was that "he was following instructions". The same occurred with the security

12   guards, who were instructed not to allow anybody from DCT Systems into the

     Lowes' offices premises.

13   28. Plaintiff contacted Mr. Thakkar, owner and President of DCT Systems, in order to

14   find explanations to what was going on but was rebuffed by Mr. Thakkar who told

     him to find answers within Plaintiff's contracting company, Datamatics.

15   29. On March 7, 2014, barely 2 weeks after DCT Systems contract was terminated at

16   Lowe's, Plaintiff learned that Mr. Kevin Summers, Lowe's Chief Information

17   Officer, had left Lowe's for undisclosed reasons.

18   30. Looking for a new job, Plaintiff was contacted by an IT recruiter that told him that he

19   had received information indicating that Mr. Kevin Summers had been terminated

20   from Lowe's for his close association with a company that was practicing illegal

21   activities at the interior of Lowes' IT Department. At this point Plaintiff intuitively

     suspected that that company was DCT Systems.

22   31. Plaintiff got in touch with Lowes' Legal Department in an attempt to clear his name

23   from any wrong doing and to keep his doors open for future hiring within Lowe's, but

24   a paralegal in Lowes' Legal Department informed him that he could not disclose any

25   information about the termination of DCT Systems or the departure of Mr. Summers

26   since they were prohibited to do so by a confidentiality agreement signed by both

27   parties. However, this paralegal from Lowes' Legal Department informed Plaintiff

28

that Lowe's was conducting an investigation of certain "irregularities" that had triggered the cancellation of DCT Systems' contract at Lowe's.

32. Plaintiff informed Mr. Kulendran from Datamatics of the felonious activities that took place at the interior of Lowe's IT Department that he'd witnessed; of the investigation being conducted by Lowe's and about the stereotype discrimination suffered at the hands of Mr. Telfare while being interviewed, which by now had become evident, but Datamatics failed to take any corrective or compensatory actions.

33. Datamatics disengaged itself from any further contract responsibility with Plaintiff by paying him a two-weeks notice clause, as included in the contract signed between Plaintiff and Datamatics. Datamatics refused to assume any other responsibility derived from these events and stopped responding emails and phone calls to Plaintiff.

34. Despite the extreme degree of confidentiality with which Lowe's handled its internal investigation of these events and despite its hermetic posture towards all the events described herein, Plaintiff came to know a version of what had happened at the interior of Lowes' IT Department and as to why DCT Systems' contract had been abruptly terminated by Lowe's. According to this version of the facts, Mr. Summers had been engaged in a sexual liaison with a DCT Systems' senior manager named Justina Barr (hereinafter "Mrs. Barr"), and that in return for those sexual favors, Mr. Summers had given authorization to increment the amount of real or apparent consulting services delivered by DCT Systems to Lowe's. As per this version, the nature of this racket included the close friendship existing between Mr. Telfare and Mr. Summers and the intimate relationship sustained between Mr. Summers and Mrs. Barr. Plaintiff contacted Mrs. Barr directly to confirm this version of the events after realizing that they, both, were members of the same professional web site (LinkedIn). When Plaintiff contacted her at her new place of work she was busy so, Plaintiff left her a message and his phone number with a secretary. A quarter of an hour later, Mrs. Barr called back Plaintiff to answer his questions. Mrs. Barr denied having any type of intimate relationship with Mr. Summers during the time they both worked together at Lowe's but admitted that she was his friend. She also admitted having heard this version of the events before and the fact that numerous people that had worked with her, either at Lowe's or at DCT Systems, have called her to ask her the same

question, something which in itself does not prove that such version of the events is true, but that in fact, and by Mrs. Barr's own admittance, many people at the interior of Lowe's and DCT Systems believed it to be true. Mrs. Barr also told Plaintiff that she didn't know as to why Lowe's ended DCT Systems' contract abruptly but she admitted that she worked for DCT Systems until March 7, 2014, the same day that Mr. Summers resigned from Lowe's.

35. After having this conversation with Mrs. Barr, Plaintiff could not make up his mind about the truthfulness and sincerity of Mrs. Barr counter allegations that she had not been involved intimately with Mr. Summers or that she had had anything to do with the conspiracy to defraud Lowe's. She sounded calm and in control of herself, but not convincing. Plaintiff cannot confirm, assure or prove that this version of the events is certain, but at the same time, he recognizes that, in the absence of any other information known to him that could had confirmed or refuted this version of the events, this explanation of what it happened at the interior of Lowe's while DCT Systems was implementing the Stage Gating Program fits perfectly with his own experience working for DCT Systems at the interior of Lowe's and with the circumstantial evidence provided by the chronology of events.

## FIRST CAUSE OF ACTION
### Racketeer Influenced and Corrupt Organizations Act ("RICO")
### 18 U.S.C § 1962 (c)

36. Plaintiff incorporate the allegations contained in paragraphs 1 through 35, as if fully set forth herein.

37. As detailed herein, DCT Systems was engaged in an enterprise to bill Lowe's for inexistent services based on the hiring and placing of IT consultants that were not executing any work at all.

38. Defendants conducted or participated, either directly or indirectly, in the management, operation and affairs of the enterprise in relation to Lowe's through a pattern of racketeering activity unlawful under 18 U.S.C. § 1962 (a). DCT Systems committed multiple and continuous violations of wire fraud under 18 U.S.C. § 1343.

The enterprise utilized included the United States interstate wire (See 18 U.S.C. § 1343), which was used to transmit fraudulent invoices to Lowe's for payment.

39. These racketeering acts were continuous for as long as Plaintiff worked for DCT Systems as a contractor.

40. DCT Systems deceived Plaintiff during the time he worked there, making him believe that the idleness and lack of work was a period of "training" and a "forced recess" imposed by the lack of clarity in relation to the direction that Lowe's IT Department should take. Plaintiff was instructed to send weekly his working hours to DCT Systems and Datamatics as any other contractor would do, and was paid promptly and on time, without realizing that he was being used by DCT Systems and Datamatics as a pawn in more elaborated scheme to defraud Lowe's. To the very end of his short contract, Plaintiff didn't suspect or was aware of what was taking place

41. As a direct and proximate result of Defendants' violation of RICO, Plaintiff suffered economic harm derived from his relocation to Charlotte, NC from Boca Raton, FL, to take on this job thinking it was a hiring in good faith. Moreover, Plaintiff has suffered economic injury derived from Datamatics' breach of contract. Plaintiff's professional image has been impacted dramatically thanks to inadvertently being used in a scheme to defraud Lowe's, an event that partially leaked out of Lowe's despite its best efforts to contained within the company, and has become known to other participants and stakeholders of Charlotte's IT Industry.

42. Pursuant to 18 U.S.C. § 1964 (c), Plaintiff is entitled to recover threefold the damages sustained and the cost of the suit, which are in excess of $10,000.00.

## SECOND CAUSE OF ACTION
### Conspiracy to Violate RICO
### 18 U.S.C. § 1962 (d) by Conspiracy to Violate § 1962 (c)

43. Plaintiff incorporate the allegations contained in paragraphs 1 through 42 as if fully set forth herein.

44. Defendants were associated with the enterprises herein described and conspired within the meaning of 18 U.S.C. § 1962 (d) to violate 18 U.S.C. § 1962 (c). That is, Defendants knowingly conspired and agreed to conduct or participate, directly or

COMPLAINT
- 11 -

indirectly, in the management and operation of the affairs of the enterprise in relation to Lowe's through a pattern of racketeering activity unlawful under 18 U.S.C. § 1961 through a multiple, repeated and continuous violations of wire fraud under 18 U.S.C. § 1343. The enterprise utilized included the United States interstate wire (See 18 U.S.C. § 1343), which was used to transmit fraudulent invoices to Lowe's for payment.

45. As detailed herein, Defendants knowingly agreed to commit or participate in at least two predicate acts in furtherance of their conspiracy.

46. As a result of Defendant DCT Systems' conduct, Plaintiff has suffered substantial harm since Defendant DCT Systems' illegal and fraudulent acts derived in Defendant Datamatics infringing the terms of the Service Agreement (Contract) signed between Plaintiff and Datamatics. Plaintiff's professional image has been impacted dramatically thanks to inadvertently being used in a scheme to defraud Lowe's, an event that partially leaked out of Lowe's despite its best efforts to contained within the company, and has become known to other participants and stakeholders of Charlotte's IT Industry.

**THIRD CAUSE OF ACTION**
Conspiracy to Violate RICO
18 U.S.C. § 1962 (d) by Conspiracy to Violate § 1962 (a)

47. Plaintiff incorporate the allegations contained in paragraphs 1 through 46 as if fully set forth herein

48. Defendant DCT Systems was associated with the enterprises herein described and conspired within the meaning of 18 U.S.C. § 1962 (d) to violate 18 U.S.C. § 1962 (a). That is, Defendant DCT Systems knowingly conspired and agreed that income in the form of payments received from Lowe's paid in response to the fraudulent received from the enterprise, would be received by Defendant DCT Systems directly or indirectly, from a pattern of activity unlawful under 18 U.S.C. 1961 in which Defendant DCT System participated as principal within the meaning of 18 U.S.C. § 1961 (1), 1961 (5) and 1962 (a), to wit: multiple, repeated and continuous violations of wire fraud under 18 U.S.C. § 1343. The enterprise utilized interstate wire (See 18

U.S.C. § 1343), which was used to transmit fraudulent invoices to Lowe's for payment.

49. An object of the said conspiracy was that income, or the proceeds of income received by Defendant DCT Systems be used or invested in the operation of the enterprise(s) for numerous legitimate and illegitimate purposes, including, but not limited to, the submission of additional fraudulent payments and the ongoing operation of the enterprise(s).

50. As detailed herein, Defendants knowingly agreed to commit or participate in at least two predicate acts in furtherance of their conspiracy.

51. As a result of Defendant DCT Systems' conduct, Plaintiff has suffered substantial harm since Defendant DCT Systems' illegal and fraudulent acts derived in Defendant Datamatics infringing the terms of the Service Agreement (Contract) signed between Plaintiff and Datamatics. Plaintiff's professional image has been impacted dramatically thanks to inadvertently being used in a scheme to defraud Lowe's, an event that partially leaked out of Lowe's despite its best efforts to contained within the company, and has become known to other participants and stakeholders of Charlotte's IT Industry.

## FOURTH CAUSE OF ACTION
### Fraud

52. Plaintiff incorporate the allegations contained in paragraphs 1 through 51 as if fully set forth herein.

53. As described in detail, supra, between January 13 and February 16, 2014, Defendant DCT Systems made numerous false statements and material misrepresentations that were intended to mislead Lowe's, and in fact mislead Lowe's by representing that the above referenced transactions were legitimate when, in fact, they were fraudulent.

54. Defendant DCT Systems made those false statements and representations knowing said representations were false, and/or with a reckless and intentional disregard for the truth with intent to deceive Lowe's.

55. Defendant DCT Systems concealed the truth of these fraudulent invoices from Lowe's with the intent to induce Lowe's to pay the fraudulent invoices and to further induce Lowe's not to investigate the validity of these invoices.

56. The false representations and concealments made by Defendant DCT Systems were of a material fact, namely that the invoices submitted represented services that Lowe's didn't require or needs that were otherwise inflated.

57. The false representation and concealments were reasonably calculated to deceive Lowe's and cause it to pay Defendant DCT Systems for the fraudulent invoices, without further investigation.

58. Defendant DCT Systems intentionally made the false representations and concealments with the intent to deceive Lowe's.

59. As a result of Defendant DCT Systems' conduct, Plaintiff has suffered substantial harm since Defendant DCT Systems' illegal and fraudulent acts derived in Defendant Datamatics infringing the terms of the Service Agreement (Contract) signed between Plaintiff and Datamatics. Plaintiff's professional image has been impacted dramatically thanks to inadvertently being used in a scheme to defraud Lowe's, an event that partially leaked out of Lowe's despite its best efforts to contained within the company, and has become known to other participants and stakeholders of Charlotte's IT Industry.

## **FIFTH CAUSE OF ACTION**
### Civil Conspiracy to Commit Fraud

60. Plaintiff incorporate the allegations contained in paragraphs 1 through 59 as if fully set forth herein.

61. Mr. Telfare, Mr. Thakkar and other employees of Defendant DCT Systems had an agreement among them to create, approve and submit fraudulent invoices for payment by Lowe's and to retain the payments made by Lowe's for the fraudulent invoices.

62. The actions of Mr. Telfare, DCT Systems' Program Manager for the Stage Gating Program, and Mr. Thakkar, President and owner of DCT Systems, amounted to a

common scheme to formulate a procedure to create, approve and submit the
fraudulent invoices.

63.  The actions of Jeff Telfare, DCT Systems' Program Manager for the Stage Gating
Program, and Chuck Thakkar, President and owner of DCT Systems, were unlawful
and undertaken with the intent to further achieve the conspiracy.

64. Lowe's paid the fraudulent invoices and Defendant DCT Systems retained the
payment for themselves.

65. As a result of Defendant DCT Systems' conduct, Plaintiff has suffered substantial
harm since Defendant DCT Systems' illegal and fraudulent acts derived in Defendant
Datamatics infringing the terms of the Service Agreement (Contract) signed between
Plaintiff and Datamatics. Plaintiff's professional image has been impacted
dramatically thanks to inadvertently being used in a scheme to defraud Lowe's, an
event that partially leaked out of Lowe's despite its best efforts to contained within
the company, and has become known to other participants and stakeholders of
Charlotte's IT Industry.

## SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duty

66. Plaintiff incorporate the allegations contained in paragraphs 1 through 65 as if fully
set forth herein.

67. Mr. Telfare, DCT Systems' Program Manager for the Stage Gating Program owed a
fiduciary duty to Lowe's

68. Mr. Telfare's role as a manager created a relationship of trust and confidence between
he and Lowe's.

69. Mr. Telfare breached that fiduciary duty by executing the above-referenced
conspiracy to the detriment of Lowe's and for the benefit of DCT Systems.

70. As a result of Defendant DCT Systems' conduct, Plaintiff has suffered substantial
harm since Defendant DCT Systems' illegal and fraudulent acts derived in Defendant
Datamatics infringing the terms of the Service Agreement (Contract) signed between
Plaintiff and Datamatics. Plaintiff's professional image has been impacted

dramatically thanks to inadvertently being used in a scheme to defraud Lowe's, an event that partially leaked out of Lowe's despite its best efforts to contained within the company, and has become known to other participants and stakeholders of Charlotte's IT Industry.

## SEVENTH CAUSE OF ACTION

Violation of the North Carolina Unfair and Deceptive Trade Practices Act

N.C. Gen. Stat. § 75-1.1 et seq.

71. Plaintiff incorporate the allegations contained in paragraphs 1 through 70 as if fully set forth herein.

72. Defendant DCT Systems actions in submitting fraudulent invoices to Lowe's were unfair and deceptive. Defendant DCT Systems' actions were unethical, unscrupulous and had a tendency to deceive.

73. Defendant DCT Systems was, at all times relevant to this Complaint, engaged in or affecting commerce.

74. As a result of Defendant DCT Systems' conduct, Plaintiff has suffered substantial harm since Defendant DCT Systems' illegal and fraudulent acts derived in Defendant Datamatics infringing the terms of the Service Agreement (Contract) signed between Plaintiff and Datamatics. Plaintiff's professional image has been impacted dramatically thanks to inadvertently being used in a scheme to defraud Lowe's, an event that partially leaked out of Lowe's despite its best efforts to contained within the company, and has become known to other participants and stakeholders of Charlotte's IT Industry.

75. As direct and proximate result of DCT Systems' willful actions Plaintiff has been injured, and pursuant to N.C. Gen. Stat. § 75-16, Plaintiff is entitled to treble damages as a result.

**EIGHTH CAUSE OF ACTION**

Violation of the North Carolina Racketeer Influenced and Correct Organizations Act

N.C. Gen. Stat. § 75D-1, et seq.

76. Plaintiff incorporate the allegations contained in paragraphs 1 through 75 as if fully set forth herein.

77. Defendant DCT Systems continuous acts of wire fraud and other acts which are chargeable by indictment, as such acts were accompanied by the necessary *mens rea* or criminal intent under the laws of this state.

78. Defendant DCT Systems' employee and owner, Mr. Telfare and Mr. Thakkar, conspired to engage in this pattern of racketeering activity.

79. Defendant DCT Systems' pattern of racketeering activity is causally connected to the pecuniary gain received from Lowe's as a result of Defendant DCT Systems' actions.

80. As a result of Defendant DCT Systems' conduct, Plaintiff has suffered substantial harm since Defendant DCT Systems' illegal and fraudulent acts derived in Defendant Datamatics infringing the terms of the Service Agreement (Contract) signed between Plaintiff and Datamatics. Plaintiff's professional image has been impacted dramatically thanks to inadvertently being used in a scheme to defraud Lowe's, an event that partially leaked out of Lowe's despite its best efforts to contained within the company, and has become known to other participants and stakeholders of Charlotte's IT Industry.

**NINTH CAUSE OF ACTION**

Violation of the Title VII of the Civil Rights Act of 1964

National Origin Discrimination

81. Plaintiff incorporate the allegations contained in paragraphs 1 through 80 as if fully set forth herein.

82. It is the belief of Plaintiff that he was recruited by Defendant Datamatics and hired by Defendant DCT Systems after being profiled based on his national origin, playing on

the negative stereotype of Colombians existing in the United States as people bias or with tendencies to illegality, corruption, drug trafficking and drug dealing.

83. It is the belief of Plaintiff that Mr. Telfare and Mr. Kulendran, employees of DCT Systems and Datamatics respectively, counted on this negative stereotype in order to carry out DCT Systems' racket at the interior of Lowe's, once this pattern of racketeering activity required individuals of a low level of integrity, just in case one of these individuals may had had discovered what was going on.

84. As a result of this perverse type of discrimination based on a stereotype of what individuals of Colombian origin are, Plaintiff has suffered terrible anguish, lack of sleep, lapses of insecurity, anxiety, loss of appetite, digestive disorders, worries about his professional future and emotional distress

85. The above described actions of Defendants were done with malice, ill-intention, fraud and reckless disregard of Plaintiff's rights. Because these acts were carried out in a deliberate and intentional matter, this conduct warrants the assessment of punitive damages in a sum sufficient to punish and deter future such conduct.

## TENTH CAUSE OF ACTION
### Breach of Contract

86. Plaintiff incorporate the allegations contained in paragraphs 1 through 85 as if fully set forth herein.

87. As per the contract signed between Plaintiff and Datamatics: *"The Contractor agrees to provide specialized services for a specific period of time (the "Temporary Assignment") to the third party business (the "Customer") that has retained Datamatics Consultants Inc. to locate temporary service providers to fulfill specific business needs"*, in this case the "Customer" being DCT Systems.

88. Plaintiff beliefs there's been a breach of employment contract because he was not hired to provide "specialized services" as stated in the contract but instead, was hired with the purpose of defrauding Lowe's upon the false pretense of being required to perform specialized services. No services at all were provided and Plaintiff was

inadvertently used by DCT Systems as a pawn in a racketeering scheme perpetrated with the aim of billing Lowe's for inexistent and unneeded specialized services.

89. Moreover, as described above, it is quite evident that the "Customer", DCT Systems, did not terminate or was its intention to terminate the Service Agreement signed between Datamatics and Plaintiff as was its right to do so, but that such Agreement was forced termination upon it by a Third Party (Lowe's) based on irregularities carried out by DCT Systems at the interior of Lowe's, as stated by Lowes' Legal Department, irregularities that could only had been in violation of the law, as in fact they were, for Lowe's to had taken such a drastic and sudden decision.

90. As a direct result of this breach of the Service Agreement signed by both parties Plaintiff has suffered great economic injury since 44 of the 52 weeks included in the terms of the Service Agreement were never paid to Plaintiff by Datamatics. Therefore, Plaintiff is entitled to recover from Defendant Datamatics in an amount at a minimum of $132,000.00

91. As direct and proximate result of DCT Systems' willful actions Plaintiff has been injured, and pursuant to N.C. Gen. Stat. § 75-16, Plaintiff is entitled to treble damages as a result.

## ELEVENTH CAUSE OF ACTION

### Claim for Punitive Damages

### N.C. Gen. Sta. § 1D-15

92. Plaintiff incorporate the allegations contained in paragraphs 1 through 91 as if fully set forth herein.

93. Plaintiff is entitled to compensatory damages as set forth above

94. Defendants' actions involved fraud, malice, and willful and wanton conduct.

95. Defendants knew or should have known that their fraudulent, malicious, willful and wanton conduct was reasonably likely to result in injury, damage, and other harm to Plaintiff. Such actions amounted to more than just gross negligence.

96. Defendants' fraudulent, malicious, willful and wanton conduct, as described herein, did proximately cause injury, damage and harm to Plaintiff.

97. Pursuant to N.C. Gen. Sta. § 1D-15, Plaintiff is therefore entitled to the recovery of punitive damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiff respectfully prays that this court:

1. Order a jury trial on all matters alleged herein;
2. Award Plaintiff actual and compensatory damages in an amount to be determined at trial, but expected to exceed $132,000.00
3. Award Plaintiff threefold damages pursuant to 18 U.S.C. § 1964(c);
4. Award Plaintiff treble damages pursuant to N.C. Gen. Sta. § 75-16;
5. Award Plaintiff punitive damages in an amount to be determined at trial;
6. Award Plaintiff's cost and expenses of this action;
7. For such and further relief as this Court deems just and proper.

Dated: July 3, 2014

Respectfully submitted,

Felipe A. Priast
309 E. Morehead Street Apt 326
Charlotte, NC 28202
Telephone: 786-417-0199
Email: felopriast@yahoo.com
IN PROPIA PERSONA (PRO SE)